UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL AIR CARGO GROUP, INC.,

                    Plaintiff,

          -v.-

MAERSK LINE LIMITED, MAERSK LINE
A/S, and A/P MOELLER MAERSK,

                    Defendants.

17 Civ. 8659 (KPF)

**<u>OPINION AND ORDER</u>**

---

KATHERINE POLK FAILLA, District Judge:

This case is the sequel to a prior dispute between similar parties, but this time the roles are reversed. On November 8, 2017 — the same day that this Court upheld a judgment requiring Plaintiff National Air Cargo Group, Inc. ("NACG") to pay Defendant Maersk Line Limited ("MLL") more than $900,000 for breaching a contract between the parties — NACG filed this action against MLL, A/P Moeller Maersk ("Maersk A/P"), and Maersk Line A/S ("Maersk A/S") (collectively, "Defendants" or the "Maersk Entities"). In this litigation, Plaintiff claims that Maersk A/S and Maersk A/P interfered with the contract between MLL and NACG, and, further, that MLL breached the contract and engaged in other misconduct.

The Maersk Entities have asked the Court to dismiss all claims against them. Maersk A/S and Maersk A/P move to dismiss the operative complaint for failure to state a claim. MLL moves for summary judgment. As set forth in the remainder of this Opinion, both motions are granted in full.

In light of the unusual procedural posture of this case, the Court has endeavored to structure the Opinion to address the different legal claims, while respecting the different standards of review under Federal Rules of Civil Procedure 12(b)(6) and 56. The factual background of the case is provided collectively. In its legal analysis, however, the Court focuses on the Second Amended Complaint (the "SAC") and documents integral to it in resolving Maersk A/S's and A/P's motion to dismiss, and discusses additional material only in resolving MLL's motion for summary judgment.

**BACKGROUND**[1]

## A.    Factual Background

### 1.    The Parties

Plaintiff NACG is a corporation organized and existing under the laws of Florida. (SAC ¶ 10). "NACG is a Prime Contractor with regards to the

---

[1]     The facts set forth in this Opinion are drawn from the Second Amended Complaint (the "SAC" (Dkt. #55)) as well as the parties' submissions in connection with the instant motions, including MLL's Local Rule 56.1 Statement ("MLL 56.1" (Dkt. #65)), Plaintiff's counterstatement ("NAGC 56.1 Opp." (Dkt. #73)), and MLL's reply statement ("MLL 56.1 Reply" (Dkt. #80)). References to individual declarations and affidavits are referred to using the conventions "[Name] Decl.," and "[Name] Aff.," respectively. The Subcontract between MLL and NACG is provided as an attachment to the Declaration of Christopher Raleigh and is referred to as "Subcontract" (Dkt. #63-1). The Fifth Amendment to the Subcontract is also provided as an attachment to the Declaration of Christopher Raleigh and is referred to as "Amendment 5" (Dkt. #63-2 at 13). For ease of reference, Maersk A/S's and Maersk A/P's joint opening brief is referred to as "Maersk Br." (Dkt. #64); MLL's opening brief as "MLL Br." (Dkt# 68); Plaintiff's combined opposition brief as "Pl. Opp." (Dkt. #71); Maersk A/S's and Maersk A/P's joint reply brief as "Maersk Reply" (Dkt. #81); and MLL's reply brief as "MLL Reply" (Dkt. #80).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement

provision of the movement of both people and goods, globally, for the United States Government." (*Id.* at ¶ 13).  Defendant MLL is a shipping corporation organized and existing under the laws of Delaware, with its principal office and place of business in Norfolk, Virginia; it is a United States Flag (or "U.S. flag") Carrier of Government property by water.  (*Id.* at ¶ 15).  Defendant Maersk A/S is an international container shipping company based in Aarhaus, Denmark. (*Id.* at ¶ 16).  Maersk A/P is the world's largest ocean shipping conglomerate, and is based in Copenhagen, Denmark.  (*Id.* at ¶ 17).  MLL and Maersk A/S are wholly owned subsidiaries of Maersk A/P.  (*Id.* at ¶¶ 15-16).

### 2.    The Subcontract Between MLL and NACG

On January 23, 2013, NACG entered into a subcontract with MLL ("the Subcontract"), by which MLL agreed to provide shipping services to NACG to aid the latter in fulfilling a multimodal transportation contract that NACG held with the U.S. Department of Defense ("DOD").  (SAC ¶¶ 20-21).  This multimodal contract provided that NACG would be responsible for the movement and delivery of DOD's freight.  (*Id.*).  The Subcontract begins by describing the parties as "National Air Cargo Group, Inc. ... as the Prime contractor, and Maersk Line, Limited ... as the Subcontractor[.]" (Subcontract 1).  At no point does the contract reference Maersk A/S or Maersk A/P.  (*See generally* Subcontract).

---

by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Subcontract required NACG to compensate MLL for the provision of two services: freight movement (i.e., shipping) and management services (which included monitoring services and creating invoices). (SAC ¶ 23). Management services were compensated by a Management Service Fee, which was sometimes called the "Exclusivity Service Fee" or the "Exclusivity Fee." (*Id.*). The Exclusivity Fee is discussed at Paragraph 10 of the Subcontract (the "Exclusivity Clause"), which initially provided:

> 10. VOLUME AND EXCLUSIVITY:
>
> - National and Maersk agree that no guarantee or representation has been made regarding volumes. There is no minimum volume of freight or cargo contemplated within this subcontract.
>
> - Maersk will be National's exclusive (P1) container ocean carrier under the Commercial Multi-Modal Contract, for both pro-grade and retrograde operations.
>
> - Maersk will not provide ocean transportation services under the Commercial MultiModal Contract to any other non-affiliated prime contractor: provided, nothing herein shall supersede, conflict with or materially affect the obligations of any Maersk affiliated entity as a "common carrier" under applicable law.

(Subcontract 6).

The Subcontract also contained the following termination provision:

> Either Party may terminate, without cause, by giving thirty (30) days written notice to the other; provided, such termination shall have no effect on obligations of the parties under this Agreement for cargo awarded under the Commercial Multi-Modal Transportation Contract prior to such termination notice.

(NACG 56.1 Opp. ¶ 8).  From 2013 to mid-2016, MLL provided ocean transportation, container storage and detention, and management services to NACG.  (MLL 56.1 ¶ 9).

The parties amended the Subcontract six times, with the crux of this dispute concerning the fifth amendment ("Amendment 5"), which was dated February 23, 2015, and which amended the Exclusivity Clause to allow MLL to provide specific services to Liberty Global Logistics, LLC for specific shipping routes through Riga, Latvia and Baku, Azerbaijan.  (SAC ¶¶ 23-24).  Amendment 5 revised the third bullet point of the Exclusivity Clause as follows:

> With the exception of performing ocean transportation services directly or indirectly for prime contractor Liberty Global Logistics LLC under the Contract, and expressly limiting such exception to the (i) North America-Latvia (Riga) and (ii) North America — Azerbaijan (Baku) corridors, Maersk will not provide ocean transportation services under the Commercial Multi-Modal Contract to any other non-affiliated prime contractor; provided, nothing herein shall supersede, conflict with or materially affect the obligations of any Maersk-affiliated entity as a "common carrier" under applicable law.

(Amendment 5 at 1).

### 3. The Contract Between Maersk A/S and APL

On November 26, 2014, Maersk A/S entered into a contract with American President Lines, Ltd. ("APL"), another prime Government contractor, to provide shipping services (the "Slot Agreement").  (SAC ¶ 26).  APL is a direct competitor of NACG.  (*Id.* at ¶ 28).  The Slot Agreement allowed both APL and Maersk A/S to offer reduced rates on services — which, it is alleged, drastically reduced NACG's ability to offer competitive prices and acquire business.  (*Id.* at

¶¶ 29-31). NACG alleges that the Maersk Entities and APL conspired to reduce prices artificially and thereby drive NACG out of the market for container shipping. (*Id.* at ¶ 33). According to NACG, the Maersk Entities were aware of each other's customer information due to government disclosure rules. (*Id.* at ¶ 43). Maersk A/P, the parent company of both MLL and Maersk A/S, is alleged to have capitalized on this transparency and on its complex corporate structure to subvert the Exclusivity Clause of the Subcontract between NACG and MLL. (*Id.* at ¶ 38).

### 4. The Disputes Between MLL and NACG

As may be obvious from the litigation history, it was not smooth sailing for NACG and MLL under the Subcontract. Early on, NACG's representatives, Ted Pendleton and Kenneth Lundgren, complained to MLL's Vice President and Chief Commercial Officer, Torben Svenningsen, that the costs of the Subcontract were making NACG uncompetitive. (MLL 56.1 ¶ 12). In response, MLL and NAGC amended the Subcontract to allow the Management Service Fee to be waived on a case-by-case basis. (*Id.* at ¶ 13). The amendment resolved the short-term dispute, but a second problem emerged in December 2014, when Svenningsen advised Pendleton that Maersk A/S would shortly enter into the Slot Agreement with APL. (*Id.* at ¶ 14). NACG responded that this constituted a breach of the Exclusivity Clause and requested a discount of MLL's Management Service Fee on future food shipments. (*Id.* at ¶ 15).

Svenningsen responded in early 2015, agreeing with Pendleton to waive the Management Service Fee for food shipments effective July 1, 2015.

(Svenningsen Decl. ¶ 18). Lundgren confirmed the agreement by email, stating: "Additionally, per your agreement with Ted in June, effective 1 July 2015 [NACG] would no longer incur a fee for the food shipments since Maersk was no longer exclusive." (MLL 56.1 ¶ 17). MLL considered the dispute settled and recalled no further complaints, while NACG maintains that the billing continued and the dispute was unresolved. (*Id.* at ¶¶ 19-21; NACG 56.1 Opp. ¶¶ 19-21).

The parties attempted to negotiate a new agreement in 2016. (MLL 56.1 ¶¶ 23-26). The negotiations included a proposed revision eliminating the Exclusivity Clause. (*Id.* at ¶ 24). But there remained an additional obstacle in the form of fees owed by NACG. As such, on July 1, 2016, Svenningsen informed NACG that MLL would execute a new agreement "upon learning details on how [NACG] is going to get caught up on both the overdue freight charges as well as [management service fee] payments." (*Id.* at ¶ 27). Upon receiving no response, on July 14, 2016, Svenningsen informed NACG that it was in default, demanded $755,000, stated that a hold would be placed on NACG cargo, and terminated MLL's business relationship with NACG. (*Id.* at ¶¶ 28-29).

### 5. The 2016 Litigation

On August 8, 2016, MLL brought suit against NACG for breach of contract. *Maersk Line Ltd.* v. *Nat'l Air Cargo Grp., Inc.,* No. 16 Civ. 6272 (KPF), 2017 WL 4444941 (S.D.N.Y. Oct. 4, 2017) ("*MLL I*" or the "2016 Litigation"). MLL alleged that NACG had failed to make payments for shipping services and

owed $777,655.15 under the Subcontract. *Id.* at *1. On September 16, 2016, the parties agreed to a stay the case pending arbitration. *Id.* On June 2, 2017, the arbitration panel issued a final award in favor of MLL, comprising principal debt of $777,655.15, pre-award interest of $128,281.14, arbitrator compensation and expenses of $2,020.00, and post-award interest at an annual rate of 9% accruing 30 days from the date of the award. *Id.* On June 13, 2017, MLL moved for summary judgment before this Court to confirm the total arbitral award of $907,956.29, and the Court granted the award with post judgment interest at the statutory rate. *See generally id.*

NACG asserts that it did not know about the arbitration and summary judgment proceeding in the 2016 Litigation because of the conduct of its prior general counsel. (NACG 56.1 Opp. ¶ 30).[2] On October 18, 2017, NACG filed an order to show cause, seeking a stay on the execution of the judgment and an order vacating the award in the 2016 Litigation. (16 Civ. 6272 Dkt. # 31). At the same time, NACG's principal, Chris Alf, averred that he had learned of the breach of the Exclusivity Clause in 2015, and that NACG's ability to provide services to DOD had been limited on account of that breach. (MLL 56.1 ¶¶ 34-35). On November 8, 2017, the Court heard oral argument on these issues and denied NACG's request to vacate the award in the 2016

---

[2] The Court observes that Plaintiff's current claim of ignorance is not entirely accurate, in that at least one NACG officer was aware of these matters. NACG's then-General Counsel, Mark McMillan, had specifically advised NACG's outside counsel that NACG had no defenses to the claims raised in 2016 Litigation and, further, had directed counsel not to oppose MLL's motion for summary judgment confirming the arbitral award. (*See* 16 Civ. 6272 Dkt. #33).

Litigation, while staying execution of the judgment until November 30, 2017. (16 Civ. 6272 Dkt. #43).

### 6. The 2018 Shipping Dispute

MLL has not done business directly with NACG since the termination of the Subcontract. (*See* SAC ¶ 51). According to NACG, because of the Maersk Entities' dominant position in the container shipping market between North American and Middle Eastern ports, NACG was required to use brokers (some of which would then contract with MLL) in order to fulfill its contract with DOD. (*Id.* at ¶¶ 51-52, 68-70). On one such occasion, in February 2018, NACG contracted with a broker to arrange to ship DOD containers via MLL from Newark, New Jersey, to Jebel Ali, United Arab Emirates. (*Id.* at ¶¶ 50, 52-53). NACG's freight was transported on an MLL U.S. flag carrier to Oman, but was transported from Oman to Jebel Ali on a foreign flag vessel, in violation of the Voluntary Intermodal Sealift Agreement ("VISA") governing DOD cargo shipments. (*Id.* at ¶¶ 39, 54).

NACG alleges that all the other freight that MLL transported from Oman to Jebel Ali remained on the U.S. flag carrier. (SAC ¶ 55). Indeed, NACG did not learn that its cargo had been moved to a non-U.S. flag vessel until its Contracting Officer at DOD informed it of the change. (*Id.* at ¶ 56). What is more, NACG alleges that MLL's Svenningsen deliberately alerted DOD to this issue in order to sabotage NACG's relationship with DOD. (*Id.* at ¶¶ 56-57). Specifically, NACG alleges that MLL provided negative information about NACG to DOD due to the 2016 Litigation, and that these actions resulted in DOD

reprimanding NACG. (*Id.* at ¶ 59; *see also id.* at ¶¶ 64-65 (explaining that the DOD Contracting Officer said, "You know who told me," when explaining how DOD learned that NACG's cargo was shipped via a non-U.S. flag carrier)). NACG also alleges that MLL obtained non-public information regarding NACG's communications with DOD, along with privileged internal materials between NACG representatives, through unclear means. (*Id.* at ¶¶ 61, 62, 67).

MLL holds a less favorable view of NACG's use of brokers. It states that Svenningsen investigated the shipping incident and learned that NACG had used a broker after the termination of the Subcontract to disguise the identity of the shipper and the cargo. (MLL 56.1 ¶ 47). Worse yet, Svenningsen learned that NACG was misrepresenting to DOD that NACG had an ongoing relationship with MLL, when in fact NACG no longer had access to a U.S. flag carrier. (*Id.* at ¶¶ 47-48). As for the transfer of NACG cargo in February 2018, MLL explains that after a fire occurred on an MLL vessel near Oman, two of NACG's containers were transferred from MLL's transporting vessel to a Maersk A/S non-U.S. flag ship under an emergency contingency plan. (*Id.* at ¶ 53). The same fire forced all containers on the MLL vessel to be unloaded at Oman. (*Id.* at ¶¶ 55-56). MLL states that, given NACG's use of brokers, it did not know that the cargo was DOD priority freight and thus it did not know that the cargo needed to be shipped aboard U.S. flag vessels. (*Id.* at ¶¶ 58-59).[3]

---

[3]     NACG asserts that it does not have knowledge of this investigation because of the absence of discovery. (NACG 56.1 Opp. ¶¶ 45-60). However, in an internal email, NACG acknowledges that the goods were "most likely" transferred as part of a "network decision and not a direct action by MLL against NACG" on account of "bad weather[.]" (Wright Decl., Ex. A at 29).

Svenningsen was later approached by DOD officials at a symposium in Bahrain on April 11, 2018, who requested information regarding NACG containers delivered in Dubai from a Maersk vessel. (MLL 56.1 ¶ 62). Svenningsen advised DOD that MLL no longer had a subcontract agreement with NACG; that it held an unpaid judgment against NACG; and that NACG was not authorized to use MLL as a U.S. flag carrier for DOD cargo. (*Id.* at ¶ 64). In consequence, Svenningsen requested that DOD confirm with MLL whenever a prime contractor listed MLL as its U.S. flag carrier and asked that DOD provide it with further information regarding disqualification of NACG due to misrepresentations. (*Id.* at ¶¶ 66-67).[4]

### 7. The 2018 Account Seizures

NACG also complains about other conduct by MLL after it obtained the judgment in the 2016 Litigation. NACG alleges that MLL filed a writ of execution on NACG's primary operating bank, Signature Bank, on July 31, 2018, in the amount of $936,011.91. (SAC ¶ 80). NACG further alleges that MLL served this writ after previously demanding discovery materials from NACG to obtain execution of the judgment. (*Id.* at ¶ 82). The writ, it is alleged. deprived NACG of the funds it needed to operate and was filed despite NACG's attempts to negotiate a reasonable payment plan. (*Id.* at ¶¶ 83-84). NACG alleges that many of these funds remained contested as the subject of this litigation. (*Id.* at ¶¶ 85-86). NACG attempted to negotiate a resolution through

---

[4]     NACG disputes the substance of these communications and states that it has not had the opportunity to probe these statements through discovery. (NACG 56.1 Opp. ¶¶ 64-82).

discussions with MLL, but claims that MLL failed to act in good faith.  (*Id.* at ¶¶ 88-89).

On August 16, 2018, MLL filed another writ of execution on NACG's secondary bank, Comerica Bank, for the full judgment amount.  (SAC ¶ 93).  NACG attempted to inform MLL that the full judgment had already been seized from Signature, but MLL refused to accept NACG's representations.  (*Id.* at ¶¶ 94-96).  On August 17, 2018, MLL seized an additional $115,987 from NACG via the writ served to its Comerica Bank account.  (*Id.* at ¶ 97).  NACG requested that MLL cease enforcement activities, as more than $1.05 million had been seized from NACG's accounts.  (*Id.* at ¶ 98).  MLL's efforts disrupted NACG's business and its relationship with its banks and resulted in MLL seizing more than the judgment amount.  (*Id.* at ¶¶ 99-103).  While MLL returned $105,000 of the seized funds, NACG alleges that MLL's conduct through the enforcement process was indicative of MLL's efforts to interfere with NACG's business.  (*Id.* at ¶ 104).

**B.    Procedural Background**

NACG filed its initial complaint in this action on November 8, 2017.  (Dkt. #4).  In response to requests from the Maersk Entities to file motions to dismiss and for summary judgment, NACG filed an amended complaint on August 10, 2018.  (Dkt. #45).  After this filing, the Maersk Entities reiterated their requests to file motions, and NACG requested leave to file the Second Amended Complaint, which was filed on September 14, 2018.  (Dkt. #55).  The SAC asserts seven claims, which can be divided into three broad categories:

(i) breach of contract, trade libel, and breach of the implied covenant of good faith and fair dealing claims against MLL; (ii) tortious interference with contract and tortious interference with prospective business relations claims against Maersk A/S and Maersk A/P; and (iii) unfair competition and *prima facie* tort claims against all parties.  (SAC ¶¶ 107-39).

On October 12, 2018, Maersk A/S and Maersk A/P filed a motion to dismiss (Dkt. #62-64), and on October 12 and 15, 2018, MLL filed a motion for summary judgment (Dkt. #57, 65-68).  On December 7, 2018, Plaintiff filed a combined opposition to Defendants' motions.  (Dkt. #71-75).  On January 4, 2019, Maersk A/S and Maersk A/P filed their reply papers in support of the motion to dismiss (Dkt. #81), and MLL filed its reply papers in support of the motion for summary judgment (Dkt. #77-80).  Accordingly, the motions are fully briefed and ripe for review.

## DISCUSSION

### A.    The Court Grants Maersk A/S's and Maersk A/P's Motion to Dismiss

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v.

13

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court is not limited to the face of the complaint.  Rather, the court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [relevant government agencies], and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)); *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

The parties dispute the extent to which the Court may consider documents submitted in support of MLL's motion for summary judgment in resolving Maersk A/S's and Maersk A/P's motion to dismiss.  Maersk A/S and Maersk A/P argue that they may use these documents "as a court may take

judicial notice of matters in the public record." (Maersk Br. 11). The Court agrees with Plaintiff that this argument misperceives the governing law. (*See* Pl. Opp. 3-7). The Second Circuit's holding in *Goel*, to which Defendants cite favorably, clarifies, "A complaint that alleges facts related to or gathered during a separate litigation does not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that litigation." *Goel*, 820 F.3d at 560. While the procedural posture of this case is somewhat distinct, given that the Court is dealing with different dispositive motions in response to the same operative complaint, the Court understands *Goel* to limit its consideration of documents to those integral to the SAC. In this category, the Court considers the Subcontract and Amendment 5, both of which Plaintiff relies on throughout the SAC, but not the Svenningsen Declaration, which MLL filed in connection with its motion for summary judgment.

### 2. Plaintiff Fails to State a Claim Against Maersk A/S and Maersk A/P for Tortious Interference with Contract

#### a. Applicable Law

Under New York law, which governs disputes under the Subcontract (Subcontract 7), a claim of tortious interference with contract requires a plaintiff to prove (i) "'the existence of a valid contract between the plaintiff and a third party'; [ii] the 'defendant's knowledge of the contract'; [iii] the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; [iv] 'actual breach of the contract'; and [v] 'damages resulting therefrom.'" *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d

Cir. 2006) (quoting *Lama Holding Co.* v. *Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)). Additionally, a plaintiff must allege "that the defendant's actions were the 'but for' cause of the alleged breach — in other words, that there would not have been a breach but for the activities of the defendant." *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (summary order); *see also LuxSoma LLC* v. *Leg Res., Inc.*, 289 F. Supp. 3d 514, 523 (S.D.N.Y. 2018) (citing *Katel L.L.C.* v. *AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) ("A plaintiff must also establish 'the defendant's intentional and unjustified procurement of the third party's breach of the contract.'"). "Although on a motion to dismiss the allegations in a complaint should be construed liberally, to avoid dismissal of a tortious interference with contract claim a plaintiff must support his claim with more than mere speculation." *Burrowes* v. *Combs*, 808 N.Y.S.2d 50 (1st Dep't 2006).

b.    **Discussion**

NACG's arguments regarding tortious interference with contract are somewhat puzzling. NACG alleges that by dint of Maersk A/S entering into the Slot Agreement with APL, *MLL* breached the Subcontract: "Maersk A/S's contract with plaintiff's competitor APL (which gained control of the Multi-Modal Contract) resulted in MLL's breach of the exclusivity provision of its subcontract with plaintiff (SAC ¶¶ 2, 27, 48, 110)." (Pl. Opp. 9). It is not clear from Plaintiff's pleadings or briefing how this is so. The Subcontract itself makes no reference to any Maersk Entities beyond MLL — apart from an explicit carveout for Maersk-affiliated entities to continue operating as common

16

carriers.  (Subcontract 6).  And while the SAC repeatedly asserts that the contract between Maersk A/S and APL was immensely damaging to NACG, it is unclear why this is relevant where neither Maersk A/S nor Maersk A/P was a party to the Subcontract.

Absent some allegation that Maersk A/S and Maersk A/P were the alter-egos of MLL, it is not clear how a separate corporation signing a contract with Plaintiff's competitor could possibly constitute a breach of MLL's exclusivity requirement.  Each of the citations to the SAC offered by Plaintiff in opposing the motion to dismiss (*see* Pl. Opp. 12 (citing SAC ¶¶ 26-27, 46, 110, 137)) merely asserts that the Slot Agreement breached the Exclusivity Clause of the Subcontract without further explanation (*see, e.g.*, SAC ¶ 26 ("Maersk A/S's agreement with APL knowingly interferes with and violates the exclusivity provision (including Amendment 5) of the Subcontractor Agreement.")).  Under New York law, it is insufficient to allege in conclusory terms that a contract existed and was breached.  *See, e.g.*, *Kirch*, 449 F.3d at 401-02 (finding that an allegation that a contract counterparty "walked away" from a project is insufficient to establish that the terms of a contract were violated); *Leadsinger, Inc.* v. *Cole*, No. 05 Civ. 5606 (HBP), 2006 WL 2320544, at *11-12 (S.D.N.Y. Aug. 10, 2006) (dismissing claim for tortious interference where party failed adequately to allege the specific breach); *Pitcock* v. *Kasowitz, Benson, Torres & Friedman, LLP*, 915 N.Y.S.2d 239, 241 (1st Dep't 2011) ("[P]laintiff has failed to state [a claim for tortious interference with contract because he] has not alleged, in non[-]conclusory language, the essential terms of the parties'

contract, including the specific provisions upon which liability is predicated[.]");
*cf. Bennett* v. *State Farm Fire and Cas. Co.*, 26 N.Y.S.3d 554, 555 (2d Dep't 2016) (noting that a party must "plead the terms of the alleged underlying contract … and any specific breach thereof").

While NACG alludes to a conspiracy among the Maersk Entities, it offers nothing beyond conclusory allegations that these companies worked together in entering the Slot Agreement with APL. Seeking to shore up its conspiracy arguments in its briefing, Plaintiff contends that "the SAC clearly states that Maersk A/S and A/P either working in concert together and/or with MLL, procured or caused MLL to breach the subcontract when Maersk A/S contracted with APL to provide shipping container services to APL[.]". (Pl. Opp. 12). The effort fails: Plaintiff's argument both equivocates as to whether Maersk A/S and Maersk A/P were in fact working with MLL, *and* fails to provide any particularized facts as to how the Maersk Entities worked together. For instance, the SAC provides no description of when such an agreement was formed, who was involved, and what role the Subcontract played in these discussions. The conclusory allegations that Maersk A/S/ and A/P were "either working in concert together and/or with MLL" are insufficient to demonstrate a conspiracy among the Maersk Entities. *See Masefield AG* v. *Colonial Oil Indus.*, No. 05 Civ. 2231 (PKL), 2006 WL 346178, at *4 (S.D.N.Y. Feb. 15, 2006) (dismissing a complaint for tortious interference where "conclusory allegations with respect to [the defendant] lack[ed] any factual underpinnings in the amended counterclaim").

Having failed to plead a conspiracy, NACG could have argued that the various corporate entities were alter-egos. And NACG alludes to such a claim in the SAC, stating that "Maersk A/P used its complex, global corporate structure to subvert and circumvent its subsidiary's explicit grant of exclusivity." (SAC ¶ 38). However, Plaintiff specifically disavows such an argument in its briefing and acknowledges tbat the Maersk Entities are separate corporations with separate identities. (*See* Pl. Opp. 10).

Plaintiff protests that it is not required to show that the various Maersk Entities are alter-egos or act as a single entity, and cites to various allegations in the SAC to the effect that the Slot Agreement left NACG uncompetitive in the shipping market. (Pl. Opp. 9-12). But the sole case that Plaintiff cites in support of its position is *Momentive Performance Materials USA, Inc.* v. *AstroCosmos Metallurgical, Inc.*, No. 07 Civ. 567 (FJS) (DRH), 2009 WL 1514912, at *5 (N.D.N.Y. June 1, 2009), and that case arose in a decidedly different context. (Pl. Opp. 11). The issue of alter-egos in *Momentive Performance Materials* concerned affirmative defenses related to the defendant's assertion of economic justification for any interference in contractual relations. *See* 2009 WL 1514912, at *5 (identifying the defendants' two grounds for dismissal as "(i) the economic interest defense and (ii) the defense that, because Defendant[s] ... are sister companies, Plaintiff cannot hold Defendant CLEGC liable for interfering with the contractual and/or business relationship between GE and Defendant AstroCosmos because any such interference results from Defendant CLEGC's attempt to protect its own economic interests"). In sharp

contrast, Maersk A/S and Maersk A/P have not raised an affirmative defense of economic justification, but have instead argued that NACG has failed to plead adequately that entry into the Slot Agreement was in any way a breach of contract.

The Court agrees with Defendants that nothing in the Subcontract prevents other Maersk entities from entering into separate agreements, and the SAC fails to allege with any particularity how the Slot Agreement constitutes a breach of the Subcontract, or how separate entities entering into a separate agreement caused MLL to breach the Subcontract. Absent these two essential elements, the Court dismisses this claim.

Furthermore, the Court is concerned about the consequences of accepting Plaintiff's arguments. If a parent company could be held liable for breaching an exclusivity provision in a situation where said provision was signed only by a corporate subsidiary, the immediate effect would be to give outsized negotiating power to the smaller counterparty. The broader effect would be to limit, if not foreclose, larger companies from operating freely in the market. The cost of these restrictions would fall on consumers, who would likely face higher prices and fewer choices as large companies struggled to discern with whom they could do business in light of the various economic relationships engendered by their subsidiaries. For these reasons as well, the Court holds that Plaintiff has failed to state a claim for tortious interference with contract.

3. **Plaintiff Fails to State a Claim Against Maersk A/S and Maersk A/P for Tortious Interference with Prospective Business Relations**

   a. **Applicable Law**

To state a claim for intentional interference with prospective business relations under New York law, "four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendant interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.'" *Catskill Development, L.L.C.* v. *Park Place Entertainment Corp*, 547 F.3d 115, 132 (2d Cir 2008) (citing *Lombard* v. *Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002)). A plaintiff must also establish causation by demonstrating "that she 'would have entered into an economic relationship but for the defendant's wrongful conduct.'" *Tucker* v. *Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014) (quoting *Memnon* v. *Clifford Chance US, LLP,* 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009)). "This tort is a difficult one to sustain, with requirements more demanding than those for interference with [the] performance of an existing contract." *PKG Grp., LLC* v. *Gamma Croma, S.p.A.,* 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006).

The salient distinction between claims for tortious interference with contract and claims for tortious interference with business relations concerns the defendant's mental state: "In the case of tortious interference with contract, a plaintiff may recover if the plaintiff can demonstrate that the

'defendant's deliberate interference result[ed] in a breach of [the] contract.'" *Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 908 (S.D.N.Y. 2016) (quoting *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 189 (2004)), *as amended*, (Sept. 16, 2016), *reconsideration denied*, 2016 WL 6652733 (S.D.N.Y. Nov. 10, 2016). But "[i]n the case of tortious interference with prospective economic advantage, ... the 'plaintiff must show more culpable conduct on the part of the defendant.'" *Id.* (quoting *Carvel*, 3 N.Y.3d at 190). To state a prospective-economic-advantage claim, a plaintiff must show that "the defendant's conduct ... amount[s] to a crime or an independent tort," or that the defendant has "engage[d] in conduct for the sole purpose of inflicting intentional harm on" the plaintiff. *Carvel*, 3 N.Y.3d at 190 (internal quotation marks and citation omitted); *see also Sidney Frank Importing Co.* v. *Beam Inc.*, 998 F. Supp. 2d 193, 211-12 (S.D.N.Y. 2014) (finding that mental state for prospective-economic-advantage claim "is more exacting" than that for a contract-interference claim "because courts must balance a plaintiff's expectation in establishing a contractual relationship against the competing interest of the interferer ... and the broader interest of fostering healthy competition" (internal quotation marks and citations omitted)).

### b. Discussion

NACG fails plausibly to allege that Maersk A/S's entry into the Slot Agreement with APL was either (i) "a crime or independent tort" or (ii) entered into "for the sole purpose of inflicting intentional harm on plaintiff[]." *Carvel*, 3 N.Y.3d at 190. As discussed above, beyond conclusory assertions that the

Maersk Entities conspired to drive NACG out of the market for shipping DOD's goods, the SAC is bereft of particularized allegations showing that Maersk A/S, Maersk A/P, and MLL coordinated this activity. The allegations merely assert that these separate entities were aware of MLL's Subcontract and that Maersk A/S signed a separate contract that was harmful to NACG's business. As Maersk A/S and Maersk A/P point out, the Slot Agreement was an ordinary commercial contract, approved by relevant regulatory agencies. (Maersk Br. 16-17; Maersk Reply 4-6). There is no suggestion that such a contract constitutes a crime or independent tort, or that it was entered into solely to harm NACG.[5]

Additionally, NACG has failed adequately to plead causation. This Court has already held in the 2016 Litigation that NACG was liable to MLL for breach of the Subcontract. *MLL I*, 2017 WL 4444941, at *1-3. Contractual relations between NACG and MLL did not continue after this initial dispute. The allegations in the SAC do not permit the Court to conclude that, but for the Slot Agreement, the relationship between NACG and MLL would have continued despite these fundamental contractual disputes. Numerous cases have stressed that this causation requirement is vital to a tortious interference with business relations claim. *See, e.g., Gallagher* v. *N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 4389 (GBD), 2017 WL 4326042, at *5 (S.D.N.Y. Sept. 20,

---

[5] NACG does state in the SAC that Maersk A/S violated the Voluntary Intermodal Sealift Agreement ("VISA"). (SAC ¶¶ 39-40). At no point in its opposition motion does NACG raise this issue or suggest that this constitutes a crime or independent tort (*See* Pl. Opp. 12-14), and the Court does not consider this potential regulatory violation an allegation of a crime or independent tort against NACG.

2017) ("Plaintiff[] … must specify some particular, existing relationship through which [it] would have done business but for the allegedly tortuous behavior." (quoting *Commercial Data Servers, Inc.* v. *Int'l Bus. Mach. Corp.*, 166 F. Supp. 2d 891, 898 (S.D.N.Y. 2001))), *aff'd*, 733 F. App'x 3 (2d Cir. 2018) (summary order). In its opposition, NACG fails to cite to any case law finding tortious interference with a prospective business relationship in similar circumstances. (Pl. Opp. 12-14).

The Court concludes that Plaintiff has failed adequately to allege either the requisite mental state or causation. Accordingly, the claim against Maersk A/S and Maersk A/P for tortious interference with a business relationship must be dismissed.

### 4. Plaintiff Fails to State a Claim Against Maersk A/P and Maersk A/S for Unfair Competition

#### a. Applicable Law

"'The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another' with 'some element of bad faith.'" *Universal Instruments Corp.* v. *Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 51 (2d Cir. 2019) (quoting *Saratoga Vichy Spring Co.* v. *Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)). The law of unfair competition is flexible. *See Roy Export Co. Establishment of Vaduz, Liechtenstein* v. *Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982) ("New York courts have noted the 'incalculable variety' of illegal practices falling within the unfair competition rubric[.]"). In this case, NACG alleges that the Maersk Entities

24

misappropriated NACG's prime contract with DOD. "To properly assert this claim, which is a subset of New York's unfair competition law, a plaintiff must allege that a defendant misappropriated plaintiff's [property] and displayed some element of bad faith in doing so[.]" *Schroeder* v. *Pinterest Inc.*, 17 N.Y.S.3d 678, 693 (1st Dep't 2015). "Bad faith is an essential element of an unfair competition claim. Mere negligence or recklessness is insufficient to sustain this claim; instead, a plaintiff must establish bad faith by showing that the defendant acted out of a dishonest purpose." *Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 275 (S.D.N.Y. 2014), *aff'd*, 610 F. App'x 69 (2d Cir. 2015) (summary order).

### b. Discussion

The Court again finds Plaintiff's allegations of conspiracy, collusion, and malevolence amongst the Maersk Entities to be lacking in particularized facts sufficient to support an allegation of bad faith. In opposition, Plaintiff asserts:

> The SAC further alleges that Maersk A/S and Maersk A/P "committed acts, previously referred to herein, that injured the good will and business reputation of NACG," and that they did so "maliciously, fraudulently, and oppressively, with the wrongful intention of injuring NACG, with an improper and evil motive amounting to malice, and in conscious disregard of NACG's rights."

(Pl. Opp. 15). These assertions are precisely the type of conclusory allegations of evil intent that *Iqbal* instructs courts not to accept. 556 U.S. at 678-79.

Separately, Plaintiff's allegations with regards to the particular property misappropriated are difficult to follow. While Plaintiff asserts that Maersk A/S and Maersk A/P somehow misappropriated NACG's prime Multi-Modal

Transportation Contract with DOD, the SAC offers no explanation for how a separate contract between separate entities untethered to NACG constitutes a misappropriation of an ongoing contract between NACG and DOD. There is no suggestion that DOD cancelled its contract with NACG after the Slot Agreement, and the Court has already found that Maersk A/S was not prohibited from entering into contracts with NACG's competitors.

Plaintiff argues that "the SAC alleges that Maersk A/S's and A/P's tortious contract with APL was aimed at exploiting their scale and pricing power to debilitate NACG." (Pl. Opp. 14). This assertion seems to sound in some form of antitrust argument regarding the Maersk Entities' market power, but it provides no explanation for how Maersk A/S's Slot Agreement can be considered to have stolen NACG's separate Subcontract. Absent particularized pleading regarding bad faith, and clarity on how exactly NACG's property was misappropriated, Plaintiff's claim for unfair competition fails.

### 5. Plaintiff Fails to State a Claim Against Maersk A/P and Maersk A/S for *Prima Facie* Tort

#### a. Applicable Law

Under New York law, four elements are necessary to establish a claim for *prima facie* tort: "[i] an intentional infliction of harm; [ii] without excuse or justification and motivated solely by malice; [iii] resulting in special damages; [iv] by an act that would otherwise be lawful." *United States for Use and Benefit of Evergreen Pipeline Const. Co., Inc.* v. *Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996). The standard for the second element is stringent. *See*

*McKenzie* v. *Dow Jones & Co., Inc.*, 355 F. App'x 533, 536 (2d Cir. 2009) (summary order) ("New York courts have been very strict in holding that a cause of action for *prima facie* tort will not lie unless the actions complained of can be plausibly said to have been motivated solely by malice towards the plaintiff."). The elements also include sufficiently specific special damages. *See DiSanto* v. *Forsyth*, 684 N.Y.S.2d 628, 629 (2d Dep't 1999) ("Special damages, which are an essential element of both injurious falsehood and prima facie tort, must be pleaded with sufficient specificity").

### b. Discussion

As in its discussion of the claims for tortious interference with a business relationship and unfair competition, the Court finds Plaintiff's pleading deficient with respect to malice. The pleading standard for *prima facie* tort allows for claims only where malice is the sole motivating factor in a defendant's decision; any profit motive will defeat a *prima facie* tort claim. *See Margrabe* v. *Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (summary order) ("To prevail on a prima facie tort claim, a plaintiff must plead that the only motivation for the act was 'disinterested malevolence.'" (quoting *Twin Lab., Inc.* v. *Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990))). Plaintiff acknowledges in the SAC that the Slot Agreement provided Maersk A/S and Maersk A/P with business advantages: "Given the relative combined market share of the Maersk Entities and APL in the container shipping market, the combination of their services allowed them to provide container

shipping services well below the prevailing market[.]" (SAC ¶ 30). This acknowledgement vitiates Plaintiff's *prima facie* tort claim.

The Court also agrees with Maersk A/S and Maersk A/P that the SAC fails to plead special damages. To plead special damages, "actual losses must be identified and causally related to the alleged tortious act." *In Touch Concepts, Inc.* v. *Cellco P'ship*, 949 F. Supp. 2d 447, 484 n.30 (S.D.N.Y. 2013) (quoting *L.W.C. Agency, Inc.* v. *St. Paul Fire and Marine Ins. Co.*, 509 N.Y.S.2d 97, 100 (2d Dep't 1986)). Here, Plaintiff asserts general damages of $10,000,000 based on irreparable financial and reputational harm to NACG's business (Pl. Opp. 16), but makes no effort to connect the damages to specific tortious acts. The claim for *prima facie* tort fails.

In sum, the Court finds that none of Plaintiff's claims against Maersk A/S or Maersk A/P is adequately alleged, and it therefore grants their motion to dismiss in full.

## B.     The Court Grants MLL's Motion for Summary Judgment[6]

### 1.     Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

The Court turns next to MLL's motion for summary judgment, which motion is more closely tied to the 2016 Litigation. Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[6]     MLL has moved for judgment on the tortious interference claims (MLL Br. 12), but NAGC clarifies that these are only brought against Maersk A/S and Maersk A/P (Pl. Opp. 3). Accordingly, the Court does not address these claims in this section.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[7]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).  The

---

[7]  The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

> ### 2. Plaintiff's Claims Against MLL for Breach of Contract, Unfair Competition, and Breach of the Covenant of Good Faith and Fair Dealing Are Precluded by the 2016 Litigation

> #### a. Applicable Law

As a first line of attack, MLL asserts that the 2016 Litigation forecloses all claims arising out of the Subcontract, as they were compulsory

counterclaims. (MLL Br. 4-10). Plaintiff challenges that assertion, to be sure. But Plaintiff also challenges MLL on the law to apply to the claim preclusion analysis: NACG states that New York law applies under the Subcontract (Pl. Opp. 17-18), while MLL points to decisions holding that federal claim preclusion rules apply in federal court (MLL Br. 14-15).

The New York Court of Appeals has recently made clear that "where federal preclusion principles would operate to preclude a claim — and state law principles would yield a conflicting outcome — the 'federal courts' interest in the integrity of their own processes' justifies the displacement of New York law as the federally prescribed rule of decision." *Paramount Pictures Corp.* v. *Allianz Risk Transfer AG*, 31 N.Y.3d 64, 71 (2018) (citing *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). Accordingly, the Court applies federal law.

Federal Rule of Civil Procedure 13(a) in relevant part provides:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a). The Second Circuit has long considered the standard for a compulsory counterclaim satisfied "when there is a 'logical relationship' between the counterclaim and the main claim." *Jones* v. *Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (citing *United States* v. *Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)).

For completeness, the Court considers the issue under New York law as well. While New York does not have compulsory counterclaims, New York courts do apply *res judicata* and have held that federal *res judicata* rules apply where the earlier decision came in federal court. "[A] court should apply the rules of *res judicata* followed in the jurisdiction that rendered the earlier decision[.]" *RM 18 Corp.* v. *Bank of N.Y. Mellon Tr. Co.*, 961 N.Y.S.2d 271, 274 (2d Dep't 2013). "To determine whether the doctrine of *res judicata* bars a subsequent action, we consider whether [i] the prior decision was a final judgment on the merits, [ii] the litigants were the same parties, [iii] the prior court was of competent jurisdiction, and [iv] the causes of action were the same." *Corbett* v. *MacDonald Moving Servs.*, 124 F.3d 82, 87-88 (2d Cir. 1997). As to the fourth factor, "[r]es judicata* does not require the precluded claim to actually have been litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim." *EDP Med. Computer Sys., Inc.* v. *United States*, 480 F.3d 621, 626 (2d Cir. 2007).

Under New York law, all counterclaims are permissive. *See Batavia Kill Watershed Dist.* v. *Charles O. Desch, Inc.*, 444 N.Y.S.2d 958, 960 (3d Dep't 1981) ("It is apparent that the CPLR does not require that a party plead counterclaims, and, with the possible exception of cases based on waiver ... there is no requirement of compulsory pleading of counterclaims in this State[.]"), *aff'd*, 57 N.Y.2d 796 (1982)). That said, "a party is not free to remain silent in an action in which he is the defendant and then bring a second action

32

seeking relief inconsistent with the judgment in the first action by asserting what is simply a new legal theory[.]" *Henry Modell & Co.* v. *Minister, Elders & Deacons of the Reformed Protestant Dutch Church,* 68 N.Y.2d 456, 461 (1986*); see also Classic Autos., Inc.* v. *Oxford Resources Corp.*, 612 N.Y.S.2d 32, 33 (2d Dep't 1994) (stating that New York "allows counterclaims to be raised through separate litigation ... as long as a party defendant does not remain silent in one action, then bring a second suit on the basis of a pre-existing claim for relief that would impair the rights or interests established in the first action"). In summary, New York applies *res judicata* to preclude claims that necessarily entail an attack on a prior judgment.

### b. Plaintiff's Claims Under the Subcontract Are Precluded

Under federal or New York law, the claims that NACG seeks to raise against MLL under the Subcontract are barred by the judgment in the 2016 Litigation. NACG does not address Rule 13(a), but the Court must. "A claim is compulsory if 'a logical relationship exists between the claim and the counterclaim and [if] the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Critical-Vac Filtration Corp.* v. *Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir. 2000) (citing *Adam* v. *Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991)). Here, a logical relationship exists between MLL's claim of breach of contract for unpaid invoices and NACG's counterclaim that the contract had already been breached due to MLL's conduct. Similarly, claims regarding the Slot Agreement, including the claim for unfair competition and

breach of the covenant of good faith and fair dealing, are connected to the breach of contract claims in the 2016 Litigation, as these claims presuppose that MLL had already breached the Subcontract. (*See* SAC ¶¶ 124-27,134-39). These claims are thus foreclosed by Rule 13(a).

Even under New York law, the claims would be barred by *res judicata*. NACG asserts that the claims do not meet the requirements of *res judicata*, as (i) there was no prior determination on the merits of NACG's claims of breach of contract, unfair competition, or breach of the covenant of good faith and fair dealing; (ii) Maersk A/S and Maersk A/P were not parties to the 2016 Litigation, nor was MLL in privity with them; and (iii) NACG's breach claims could not have been raised in the 2016 Litigation due to NACG's lack of knowledge. (Pl. Opp. 19-20). The Court addresses each of these claims and rejects all three.

*First*, numerous decisions from state and federal courts in New York make clear that a party cannot relitigate contractual performance when contractual performance was itself the subject of the prior litigation. *See e.g.*, *Graham* v. *Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 509-10 (S.D.N.Y. 2016) (holding that plaintiff's contract breach claims against his mortgage servicing company were precluded, when plaintiff failed to bring those claims in the prior foreclosure action); *Robert* v. *Cooper*, 979 N.Y.S.2d 585, 586 (1st Dep't 2014) (rejecting plaintiff's attempt to sue an attorney over the latter's fraudulent billing practices, when the subject of attorney's fees was at the "core" of a prior related litigation). The core of the 2016 Litigation was the

validity of the Subcontract and the parties' performance thereunder.  *Res judicata* does not require identity of claims, but only that the judgment rendered was "on the merits of the same issues or subject matter." *TechnoMarine SA* v. *Giftports, Inc.*, 758 F.3d 493,499 (2d Cir. 2014).

*Second*, the Court can quickly dispense with NACG's privity arguments. While Maersk A/S and Maersk A/P were not parties to the prior action or in privity with MLL, NACG was a party.  *Res judicata* requires only "the previous action involved the plaintiffs or those in privity with them." *TechnoMarine*, 758 F.3d at 499.  Plaintiff qualifies.

*Third*, NACG's purported lack of awareness regarding the claims it could have raised against MLL in 2016 does not excuse its failure to raise them in the 2016 Litigation.  (*See* Pl. Opp. 19 ("What Alf … stated … was that in 2015 'he began to learn' about MLL's breach.  Indeed, Alf stated that in 2016, when NACG was prevented from fulfilling the DOD contract, he 'believe[d]' that MLL and APL conspired to artificially raise prices and drive NACG out of the market."); *see also* Pl. Opp. 19-20 ("NACG intended to raise the during arbitration.  But unbeknownst to NACG, both the arbitration and MLL's summary judgment motion to enforce the default judgment occurred without NACG's knowledge." (internal citations omitted))).  As MLL points out, the relevant question is not whether Plaintiff had sufficient knowledge to bring a claim, but rather "whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."  (MLL Reply 3 (citing *TechnoMarine*, 758 F.3d at 499)).  Clearly, claims that MLL was

35

in breach of the Subcontract would have been essential information in the 2016 Litigation, and the evidence in both cases turns on interpretation of contractual provisions. The Court agrees that NACG's internal failures to communicate do not excuse it remaining silent in the prior proceeding, especially where there is no suggestion of active concealment by MLL. *See Mason Tenders Dist. Council Pension Fund* v. *Messera*, No. 95 Civ. 9341 (RWS), 1996 WL 578048, at *3 (S.D.N.Y. Oct. 8, 1996) (declining to find claim preclusion where "Defendants ... concealed from Plaintiffs the kickback and embezzlement scheme from which those claims arose"). Indeed, the key item in dispute, the Slot Agreement, was widely publicized. For all of these reasons, NACG's claims against MLL arising out of an alleged breach of the Subcontract due to the Slot Agreement — which include the claims for breach of contract, unfair competition, and breach of the covenant of good faith and fair dealing — are barred under federal and New York law.

### c. The Court Declines to Reach the Issue of Accord and Satisfaction

Separately, MLL moves for summary judgment as to the claims for unfair competition and breach of the covenant of good faith and fair dealing based on a purported agreement settling the dispute over the Slot Agreement. (MLL Br. 10-12). "An accord and satisfaction, as its name implies, has two components. An accord is an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim. Execution of the agreement is a satisfaction." *Denburg* v. *Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (1993). MLL argues that the parties' 2015 agreement that MLL would no

longer charge a Management Services Fee for food shipments in settlement and resolution of the alleged breach of the Exclusivity Clause. NACG disputes that the Management Services Fee was ever actually waived (Pl. Opp. 20-21), while MLL asserts that these fees were never actually paid (MLL Reply 4-5).

The Court observes that MLL acknowledges that "one (1) of the six (6) disputed MLL invoices reflects waived MSFs billed to NAGG on food shipments," but suggests that this fee was never actually paid. (MLL Reply 5). Given evidence suggesting that the putative settlement agreement remained unexecuted, and the concomitant need for discovery on this point, the Court cannot find accord and satisfaction as a matter of law. As the claims are already barred by claim preclusion, the Court does not consider it necessary to make assessments of competing evidentiary claims on this point.

### 3. Plaintiff's Claim Against MLL for Unfair Competition Is Legally Insufficient

The Court has discussed the applicable law of unfair competition in the context of the motion to dismiss. To review, "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring*, 625 F.2d at 1044. In opposing MLL's summary judgment motion, NACG alleges that MLL "misappropriated NACG's prime contract with the DOD" by assisting APL in undercutting NACG through lower prices and violating the Exclusivity Clause of the Subcontract. (NACG Opp. 22-23).

These claims are duplicative of NACG's breach of contract claim and cannot create an independent cause of action for unfair competition. As MLL

notes, this misappropriation claim merely provides additional allegations regarding Defendants' mental state while performing the conduct underlying the breach of contract claim. Courts are disinclined to allow unfair competition claims that merely repackage an underlying substantive allegation. *See, e.g.*, *Ferring B.V.* v. *Allergan, Inc.*, 4 F. Supp. 3d 612, 629 (S.D.N.Y. 2014) ("An unfair competition claim can only survive dismissal of a duplicative misappropriation claim if the two rest on different factual predicates."); *Fid. Info. Servs., Inc.* v. *Debtdomain GLMS Pte. Ltd.*, No. 09 Civ. 7589 (LAK), 2011 WL 4526140, at *1 (S.D.N.Y. Sept. 28, 2011) (holding that an "unfair competition claim [that] duplicates [a] copyright claim … is preempted by it"). The Court holds that NACG's unfair competition claim against MLL provides no independent factual assertions from the breach of contract claim and is thus preempted by that claim.

### 4. Plaintiff's Claim Against MLL for *Prima Facie* Tort Is Legally Insufficient

The Court has also discussed the governing law for *prima facie* torts, and finds this claim against MLL foreclosed as a matter of law as well. As discussed, the elements of the offense require, "[i] an intentional infliction of harm; [ii] without excuse or justification and motivated solely by malice; [iii] resulting in special damages; [iv] by an act that would otherwise be lawful." *Merritt Meridian Constr. Corp.*, 95 F.3d at 161. Unlike its claims against Maersk A/S and Maersk A/P, which involve execution of the Slot Agreement, NACG bases its *prima facie* tort claims against MLL on the latter's alleged misconduct with respect to the shipment of goods in 2018 and its seizure of

accounts to enforce the 2016 judgment. The Court finds that neither of these proffered bases constitutes a cognizable claim for *prima facie* tort.

The governing standard for *prima facie* tort requires a plaintiff to demonstrate the absence of any motive besides malice. With respect to the 2018 interference, which allegedly involved MLL maliciously placing two of NACG's containers on a non-U.S. flag ship to malign NACG in the eyes of DOD, the Court finds no triable issue of fact. Both sides agree that a fire played some role in the transfer, and an internal NACG email described the transfer as most likely a "network decision and not a direct action by MLL against NACG." (Wright Decl., Ex. A at 29).

NACG argues that the Court may not consider this email, as it is hearsay. (NACG Opp. 25). NACG is wrong — it is plainly a party admission. *See* Fed. R. Evid. 801(d)(2). NACG also argues that the email states that "any fire was due to a storm," and suggests that this raises a genuine dispute of fact as to the reason for the transfer. (Pl. Opp. 25). The Court disagrees. Whether a fire, a fire caused by a storm, or any other emergency situation led to the transfer, the email clearly demonstrates that NACG itself acknowledged other, malice-free motivations for the transfer.

The Court further holds that enforcement of the 2016 judgment cannot state a claim for *prima facie* tort. NACG appears to acknowledge that, standing alone, failure to settle a judgment cannot create liability, as its opposition only states that "failure to work out a resolution speaks volumes as to the bad faith and ulterior motives of MLL." (Pl. Opp. 25). In the SAC, NACG further

acknowledges both that "MLL had a right (given the judgment) to serve NACG

with … a Writ [of Execution]" and that "$105,000 [the amount seized in excess

of the judgment] [was] returned to plaintiff." (SAC ¶¶ 82, 106). While MLL's

enforcement efforts were undoubtedly aggressive, the legal enforcement of a

judgment necessarily implicates motives beyond malice, namely, the desire to

obtain money to which a plaintiff is legally entitled. MLL is entitled to

summary judgment on NACG's *prima facie* tort claim.

### 5. Plaintiff's Claim Against MLL for Trade Libel Is Legally Insufficient

#### a. Applicable Law

Trade libel, also known as injurious falsehood, "is a tort separate and

distinct from the tort of defamation." *Henneberry* v. *Sumitomo Corp. of Am.*,

415 F. Supp. 2d 423, 470 (S.D.N.Y. 2006). "The tort of injurious falsehood

'consists of the knowing publication of false matter derogatory to the plaintiff's

business of a kind calculated to prevent others from dealing with the business

or otherwise interfering with its relations with others, to its detriment.'"

*Grayson* v. *Ressler & Ressler*, 271 F. Supp. 3d 501, 519 (S.D.N.Y. 2017)

(quoting *Waste Distillation Tech., Inc.* v. *Blasland & Bouck Engineers, P.C.*, 523

N.Y.S.2d 875, 877 (2d Dep't 1988)). Trade libel — as distinct from

defamation — requires showings of malice and special damages. *Id.*; *see also*

*Ruder & Finn Inc.* v. *Seaboard Sur. Co.*, 52 N.Y.2d 663, 670-71 (1981)

("Where … the statement is confined to denigrating the quality of the business'

goods or services, it could support an action for disparagement, but will do so only if malice and special damages are proven.").

> **b.    Discussion**

In its opposition papers, NACG lists the following communications from MLL to DOD as constituting trade libel: communications alerting DOD that NACG cargo had been shipped on a foreign flag vessel, claiming that NACG was not qualified to handle the cargo, stating that MLL had obtained a judgment against NACG, and arguing that NACG was not an appropriate primary contractor for such shipments in the future.  (Pl. Opp. 26-28).  The Court does not find that NACG can demonstrate that any of these categories of statements constitutes knowing falsehoods.

To begin, the statement regarding NACG's cargo was plainly accurate, as NACG's pleadings and opposition acknowledge that shipment was made on a non-U.S. flag carrier.  NACG discusses, at length, its belief that MLL alerted DOD to this fact (Pl. Opp. 26-27), but none of this discussion demonstrates that this fact was untrue.  The same is true of MLL's statement that it held a judgment against NACG.  NACG points to an email from Svenningsen to DOD in which he states: "'without authorization [NACG] may be using MLL's VISA status for awards under the [multi-modal] contract; or that NAC[G] may be moving cargo' on MLL's vessels bypassing MLL (as the [authorized U.S. flag] carrier.'"  (Pl. Opp. 28 (citing Svenningsen Decl., Ex. I)).  But as MLL observes in reply, Plaintiff offers no explanation for why this statement is a misrepresentation of facts.  (MLL Reply 9).  The parties both acknowledge that

41

NAGC was moving cargo on MLL ships through use of a broker to "maintain confidentiality of identity." (SAC ¶ 52). Furthermore, it is not even clear that such a conditional statement constitutes a definitive statement of fact.

As for claims that NACG was not a "qualified" or "appropriate" contractor for future shipments of DOD cargo, the Court finds that these are statements of opinion that cannot be actionable as trade libel.[8] "An expression of pure opinion is not actionable." *Steinhilber* v. *Alphonse*, 68 N.Y.2d 283, 289 (1986); *see also Sandler* v. *Simoes*, 609 F. Supp. 2d 293, 303 (E.D.N.Y. 2009) ("Moreover, as with other defamation claims, a claim of trade libel may be defeated by a showing that the subject statements, when read in context, would be perceived by a reasonable person to be nothing more than personal opinion.").

The New York Court of Appeals has instructed courts to examine three factors distinguishing fact from opinion: (i) whether the language used has a precise meaning or whether it is indefinite or ambiguous; (ii) whether the statement is capable of objectively being true or false, and (iii) the full context of the entire communication or the broader social context surrounding the communication. *See Brian* v. *Richardson*, 87 N.Y.2d 46, 51 (1995). When examined in context, statements regarding whether NACG was qualified or appropriate clearly reflect MLL's belief based on the parties' negative interactions, which indicated that NACG was an unreliable partner. Terms

---

[8] Svenningsen denies having made such statements (MLL Br. 18), but the Court considers this an issue of fact.

such as "qualified" (or "unqualified") and "appropriate" (or "inappropriate") lack precise meaning and represent generalized dissatisfaction rather than factual assertions. Finally, whether a contractor is qualified or appropriate for a specific contract is not a question with an objectively true or false answer. The Court declines to find that such statements or opinions are actionable.

The Court also agrees with MLL that NACG fails to identify special damages. NACG suggests that because DOD's rating of NACG may be affected in the future, it is premature to assess special damages. (Pl. Opp. 28). The Court finds, however, that Plaintiff cannot avoid proving an essential element of its claim by merely asserting that it is premature. To do so would leave the special damages requirement toothless. The trade libel claim against MLL fails on this ground as well.[9]

### 6. Plaintiff's Claim Against MLL for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Barred as Duplicative of the Breach of Contract Claim

In addition to being precluded by the 2016 Litigation, NACG's claim against MLL for breach the covenant of good faith and fair dealing must be dismissed as duplicative of its claim for breach of contract. "A cause of action for breach of the implied duty of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages

---

[9] The Court declines to reach MLL's qualified privilege argument. (MLL Br. 19-22; MLL Reply 10-11). MLL argues in favor of a qualified privilege for communications regarding NAGC's conduct as a contractor by making public policy arguments that such communications involve the public interest in the expenditure of public funds. (*Id.*). Given that the Court finds the trade libel claim foreclosed on other grounds, it declines to opine on an issue that necessarily entails an examination of competing policy goals with potentially broad ramifications for government contractors.

allegedly resulting from a breach of the contract.'" *The Hawthorne Grp., LLC* v.

*RRE Ventures*, 776 N.Y.S.2d 273, 276 (1st Dep't 2004) (quoting *Canstar* v. *J.A.*

*Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (1st Dep't 1995)).  As MLL argues, the

damages attributed to this claim are tied to the damages based on the

ostensible violation of the Exclusivity Clause of the Subcontract.  (MLL Br. 22-

23).  The alleged additional areas of breach include: failure to inform NACG of

the Slot Agreement, undercutting NACG economically with artificially lower

prices, undertaking retaliatory measures, and failing to negotiate a good-faith

resolution of the dispute despite a good-faith negotiation requirement in the

Subcontract.  (Pl. Opp. 30).  The Court considers each of these claims to be

either an aspect of the breach of contract claim or conduct that occurred after

the Subcontract was terminated.  The alleged failure to inform NACG of the

Slot Agreement and the artificially lowered prices are clearly intrinsically tied

to the breach of contract.  Both necessarily ask whether the Slot Agreement

between Maersk A/S and APL constituted a breach of the Exclusivity Clause.

As for the 2018 conduct with respect to the transferred cargo and the seized

accounts, the Subcontract had been terminated long before these events.  The

covenant of good faith and fair dealing was no longer in operation at the

time.[10]

---

[10]    The Court does not reach the issues of Plaintiff's admissions and denies its Rule 56(d)
application.  (*See* MLL Reply 12-15).  The Court does not rely on the admissions in
reaching any of its conclusions.  Similarly, the Court principally finds that Plaintiff's
claims against MLL are barred for procedural reasons or inadequate as a matter of law.
The Court does not find that any issue of fact requires further discovery or would
change the outcome regarding any of Plaintiff's claims.  *See Gualandi* v. *Adams*, 385

**CONCLUSION**

For the reasons stated in this Opinion, MLL's motion for summary judgment is GRANTED in full.  Maersk A/S's and A/P's motion to dismiss is GRANTED in full.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    September 27, 2019
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

F.3d 236, 244 (2d Cir. 2004) (providing the factors to assess in considering a Rule 56(d) application).